**GRAND CHAMPION FILM PRODUCTION, L.L.C., et al., Appellants**

v.

**CINEMARK USA, INC., Appellee.**

No. 05–07–00449–CV.

Court of Appeals of Texas, Dallas.

June 13, 2008.

Michael A. Caddell, Richard D. Daly, Craig C. Marchiando, Caddell & Chapman, Houston, for Appellants.

Karen D. Smith, Rachael M. Rolon, Drucker, Rutledge & Smith, L.L.P., The Woodlands, for Appellee.

Before Justices WRIGHT, O'NEILL, and FRANCIS.

## OPINION

Opinion by Justice WRIGHT.

Grand Champion Film Production, L.L.C., Barry Tubb, Amanda Micallef, Rope the Moon Productions, Inc. n/k/a RTM Productions, Inc., and Madrugada Productions, Inc. (the producers) appeal from a summary judgment in favor of Cinemark USA, Inc. In three issues, the producers contend the trial court erred in: (1) finding that federal law preempted their claims for negligent misrepresentation, fraud, and conversion; (2) concluding that the statute of limitations barred their negligence and negligent misrepresentation claims; and (3) granting Cinemark's traditional and no-evidence motion for summary judgment. We overrule the producers' issues and affirm the trial court's judgment.

## Background

The producers completed a G-rated film, *Grand Champion*, in 2002. Before attempting to theatrically release the film in 2004, the producers loaned the film to several charities. The producers allowed the charities to raise money by selling tickets to screenings of the film. Alvin Davis, the president of the National Cowboy Symposium & Celebration, arranged for a screening of the film for the benefit of a non-profit entity called the Cowboy Cancer Crusade. Davis and Laura Cook, manager of the Cinemark theater in Lubbock, signed an agreement whereby the charity would receive seventy percent of ticket sales and Cinemark would receive thirty percent. According to Cook, the theater typically takes a percentage of the proceeds to cover the cost of removing another film off that particular screen. They also agreed that charity volunteers would sell paper tickets and collect the money. The charity showed the film at the Cinemark theater on September 6–8, 2002. At the end of each day's screenings, charity volunteers met with Cook to review the ticket numbers and amounts. Cook then deposited the money and sent a check directly to the charity for its portion of the ticket sales.

In 2004, the producers began their attempt to book the film for its theatrical release. Cinemark declined to show the film in any of its theaters. The producers were informed by the film's bookers that Cinemark would not book the film because it premiered in Lubbock in 2002 with poor ticket sales. The producers claim that Cinemark reported the ticket sales from the Lubbock charity screening to reporting agencies. They claim they saw the false report on a website used only by persons within the movie industry. However, they were never able to identify the website.

The producers filed this lawsuit claiming that Cinemark's inaccurate report ruined the film's commercial value. The lawsuit was originally filed in Scurry County. After Cinemark filed a motion to change venue, the case was moved to Collin County. The producers asserted claims for tortious interference, business disparagement, wrongful appropriation, defamation, negligence, negligent misrepresentation, fraud, and conversion. Cinemark filed a traditional and no-evidence motion for summary judgment as to all causes of action. In addition, Cinemark asserted that the producers' claims for fraud, negligent misrepresentation, and conversion were preempted by federal law. The producers then dropped their claims for tortious interference, business disparagement, and wrongful appropriation. The trial court granted Cinemark's traditional and no-evidence motion for summary judgment. This appeal timely followed.

## Standard of Review

The standards for reviewing a summary judgment are well established. The party moving for summary judgment has the burden of showing no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). In deciding whether a disputed material fact issue exists, precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon*, 690 S.W.2d at 548–49. Further, every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *Id.*

■ A no-evidence motion for summary judgment places the burden on the non-movant to present summary judgment evidence raising a genuine fact issue. *Espalin v. Children's Med. Ctr. of Dallas*, 27 S.W.3d 675, 683 (Tex.App.–Dallas 2000, no pet.). We review a no-evidence motion for summary judgment under the same legal sufficiency standard used to review a directed verdict. *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 832–33 (Tex.App.-Dallas 2000, no pet). Thus, we must determine whether the non-movant produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *Id.* at 833. When both traditional and no-evidence motions for summary judgment are filed, the reviewing court must uphold the summary judgment if it can be sustained under either method. *Ketter v. ESC Med. Sys., Inc.*, 169 S.W.3d 791, 799 n. 3 (Tex.App.-Dallas 2005, no pet.). When a trial court's order does not specify the basis on which it granted summary judgment, we affirm the summary judgment if any of the grounds raised in the motion are meritorious. *Moore v. Johnson*, 143 S.W.3d 339, 341 (Tex.App.-Dallas 2004, no pet.).

## Summary Judgment

In their third issue, the producers contend the trial court erred in granting Cinemark's traditional and no-evidence motion for summary judgment. The trial court granted summary judgment as to all of the producers' causes of action. We will address each of the claims in turn.

### 1. Defamation

■ The producers alleged in their petition that Cinemark negligently reported patently false statements to Rentrak and other reporting agencies that the film had been theatrically released in September 2002 and had sold only 180 tickets. Such conduct, the producers claimed, constituted defamation.

■ To maintain a cause of action for defamation, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; and (3) while acting with either actual malice, if the plaintiff was a public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998). True statements cannot form the basis of a defamation complaint. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995). Whether a publication is capable of being defamatory is initially a question of law to be determined by the court. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex.2000).

Cinemark moved for summary judgment on the defamation claim on the grounds that the producers had no evidence that it had published a statement of fact about the film, the statement was not defamatory, there was no evidence of fault on Cinemark's part, and no evidence of damages. We agree with Cinemark that there is no

evidence that it published a statement of fact.

In their appellate brief, the producers contend that Cook told Peggy Dean of Cinemark that the film screened in 2002 and had very poor attendance. The producers cite to Cook's deposition testimony as support for this statement. Cook contacted Dean for permission to go forward with the charity screening. Cook does state that she did not discuss how the film did at the charity event with anyone at Cinemark other than Dean. Dean was aware that the 2002 screening was a charity event because she obtained the approval for it. Cook did not tell Dean that the screening had very poor attendance. In fact, Cook testified that the charity was pleased with the attendance and she herself was happy because it brought in customers for an otherwise typically slow weekend for the theater.

The producers hired James Williams with American Family Movies to distribute the film. Williams hired Michael Harpster to oversee the marketing of the film and Mark Borde to arrange the theatrical booking of the film. Borde, in turn, hired Belton Clark as a subcontractor to book individual theaters. Borde and Clark worked with Williams in trying to get the film booked at theaters. Williams admitted that he did not talk with anyone at Cinemark directly and that anything Cinemark said regarding the film was relayed to him by either Borde or Clark.

Harpster testified in his deposition that he did not see any report about the 2002 Lubbock screening. Clark told Harpster that Cinemark showed the film and that it sold only 180 tickets and that is the information that he passed on to Williams.

Clark told Williams that Cinemark told him that the Lubbock screening was treated as a release and that they reported the release.

Both Williams and Amanda Micallef, a producer, testified that, after learning Cinemark would not book the film, they logged on to an unknown movie industry website with a members-only password. They saw on the website a report that the film had been released in 2002 and had only sold 180 tickets. Even assuming the truth of these assertions, however, there is no evidence that Cinemark provided this information.[1]

John Lundin, Cinemark vice president of film, testified in his deposition that Cinemark did not send any information on the film to any reporting agency prior to the film's theatrical release in 2004. All reporting is done electronically. Because no box office tickets were sold, there was nothing in the system to send. In their own petition, the producers admit that Cinemark did not use tickets with bar codes that could be tracked by a computer for the charity screening.

Ronald Giambra is the vice president of Rentrak Theatrical. He testified in his affidavit that Rentrak collects movie performance numbers. It did not receive any information from Cinemark regarding the film for any 2002 exhibition. He stated that Cinemark sent information regarding movies only through secure electronic file transfers.

G. Kendrick McDowell, general counsel for the National Association of Theater Owners (NATO) testified in his affidavit that NATO had no data regarding the Lubbock showing of the film in 2002 and

---

**1.** We note that prior to transferring the case to Collin County, the trial court in Scurry County held a hearing in this case on April 5, 2006. At this hearing, the producers' attor- ney stated "We would like to keep running down the trail to find out-get to the actual source of this information."

never published any such data. Patrick Corcoran, webmaster for the NATO website, testified that NATO never received a press release regarding the film from Cinemark. Corcoran also stated that NATO has never had ticket sales information on the members-only section of its website.

The undisputed testimony is that reporting agencies receive ticket sales information electronically. This information is obtained electronically from box office ticket sales alone. It is further undisputed that the only tickets sold for the charity screening were "old style" tickets that did not have bar codes on them. No tickets for the charity screening were sold through Cinemark's box office. We conclude that the producers failed to present more than a scintilla of evidence sufficient to raise a fact issue on whether Cinemark published a statement of fact about the 2002 Lubbock screening. Accordingly, the trial court did not err in granting summary judgment on the producers' defamation cause of action.

### 2. Negligence

■■■ The producers alleged Cinemark breached its duty of reasonable care in conducting the charity screening by reporting it as a theatrical release and reporting erroneous ticket sales. The elements of a negligence claim are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach. *D. Houston, Inc. v. Love,* 92 S.W.3d 450, 454 (Tex.2002).

Cinemark alleged in its motion for summary judgment that the producers had no evidence of any of the elements of its negligence claim. Cinemark contends that it owed no duty to the producers. We agree.

To establish the element of duty, the producers rely upon two cases. *See Hide-*

*ca Petroleum Corp. v. Tampimex Oil Int'l, Ltd.,* 740 S.W.2d 838 (Tex.App.-Houston [1st Dist.] 1987, no writ); *Susser Petroleum Co. v. Latina Oil Corp.,* 574 S.W.2d 830 (Tex.Civ.App.-Texarkana 1978, no writ). In *Hideca Petroleum,* Tampimex Oil and Hideca Trading entered into a contract for the purchase of oil. The trial court found and the appellate court agreed that Hideca Petroleum was also a party to and bound by the contract. Hideca Petroleum represented to Tampimex that it would designate a vessel to receive the oil and provide the necessary letter of credit. In reliance on these representations, Tampimex purchased the oil from a supplier. *Id.* at 841. Hideca Petroleum was unable to obtain the letters of credit and the deal fell through. The court held that Hideca Petroleum, "as the supplier of information in the course of its business for the guidance of Tampimex in its business, owed a duty to Tampimex to exercise reasonable care in obtaining and communicating correct and reliable information, as well as a duty to perform competently its obligations assumed under the contract." *Id.* at 847.

*Susser* involved an appeal of an order overruling a plea of privilege. The reviewing court had to determine whether Latina Oil had a good faith cause of action against the resident defendant, Champlin Petroleum. *Id.* at 831. Latina Oil asserted a negligent representation claim against Champlin Petroleum. Latina Oil contracted with Susser Petroleum to purchase oil. Champlin Petroleum, a supplier of petroleum products, represented through Susser Petroleum that it could supply 220,000 barrels of jet fuel. *Id.* at 832. In reliance on that representation, Latina Oil chartered a tanker and made arrangements for the disposition of the fuel. Subsequently, Champlin Petroleum informed Latina Oil that the fuel would not be available. *Id.*

Latina Oil sued Susser Petroleum for breach of contract and Champlin Petroleum for negligent misrepresentation. In holding that Latina Oil had a good faith cause of action, the court stated that Latina Oil was a known and intended recipient of Champlin Petroleum's assurances and Latina Oil acted upon such assurances to its damage. *Id.* at 832. In *Susser*, the party alleging negligent misrepresentation was the party to whom the misrepresentation was made.

Unlike the facts in this case, both *Susser Petroleum* and *Hideca Petroleum* involved a defendant who supplied information to the plaintiff for the purpose of guiding the plaintiff in matters of business. Accordingly, these cases do not help the producers establish the element of duty for their negligence claim. We conclude the trial court properly granted summary judgment on the producers' negligence cause of action.

### 3. Fraud

■ The producers alleged in their petition that Cinemark represented that the September 2002 screening would be treated as a charity movie event which is not subject to reporting. They contend that they relied upon this representation.

■ The elements of fraud are: (1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation intending that the other party act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998). In its motion for summary judgment, Cinemark asserted that the produc-

ers had no evidence of the elements of fraud.

Lundin testified that Cook stated that no information with regard to Grand Champion was reported to either EDI or Rentrak. Only tickets sold through the box office are reported electronically. Because tickets for the charity screening were not sold through the box office, there was nothing to report.

The only person Cinemark communicated with regarding the September 2002 screening was Davis with the Cowboy Cancer Symposium. The producers agreed to allow Davis to use the film for a charity screening. The only conversation Micallef had with Davis concerned the place that the film was to be delivered. Micallef testified at her deposition that she and Tubb understood that one-hundred percent of the proceeds were to go to the charity. Although Micallef did not communicate this condition to Davis, she understood that Tubb had done so. Tubb testified in his deposition, however, that he told Davis of only one condition—that there was to be no marketing of the film. Tubb did not discuss the proceeds of the charity screenings with Davis. The only condition the producers established was that Davis could not market or advertise the film. Moreover, all the evidence indicates that this film was shown strictly as a charity screening. The charity used "old style" tickets that did not have bar codes. Cook testified that all reporting of ticket sales is done electronically and only bar coded tickets sold through the box office are electronically reported.

The summary judgment evidence established that Cinemark did not make any representation to the producers that they relied upon in making its decision to allow Davis to use the film. Accordingly, the trial court did not err in granting sum-

mary judgment on the producers' fraud claim.

### 4. Negligent Misrepresentation

■ The producers alleged that Cinemark represented that the September 2002 screening would be treated as a charity movie event and that all proceeds would go to charity. They contend that they relied upon the misrepresentations.

■ The elements of a negligent misrepresentation claim are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex.1999); *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991). To establish a negligent misrepresentation claim, the plaintiff must also prove that the defendant misrepresented an existing fact rather than a promise of future conduct. *See Sloane*, 825 S.W.2d at 442; *Dallas Firefighters Ass'n v. Booth Research Group, Inc.*, 156 S.W.3d 188, 194 (Tex.App.-Dallas 2005, pet. denied)

Cinemark asserted that it was entitled to summary judgment on the producers' negligent representation claim because they cannot establish any of the required elements. Micallef stated in her affidavit that Cinemark confirmed that all proceeds would go to charity. Micallef said she learned of this two days prior to the screening from a newspaper article where Cinemark allegedly told a reporter that one-hundred percent of ticket revenues would go to the charity. Davis and Cinemark entered into their agreement providing for the 70/30 split, however, four days prior to the screening. Accordingly, the producers could not have relied upon this statement in allowing the film to be shown. *See Dorsett Bros. Concrete Supply, Inc. v. Safeco Title Ins. Co.*, 880 S.W.2d 417, 420 (Tex.App.-Houston [14th Dist.] 1993, pet. denied) (plaintiff could not have detrimentally relied on alleged misrepresentation in supplying materials because materials supplied before alleged misrepresentation made); *Morgan v. Amarillo Nat'l Bank*, 699 S.W.2d 930, 937 (Tex.App.-Amarillo 1985, writ ref'd n.r.e.) (1982 reliance impossible on 1983 misrepresentation).

We conclude that there is no evidence that Cinemark represented that all proceeds would go to charity or that the producers relied upon any such representation. Accordingly, the trial court did not err in granting summary judgment on the negligent representation cause of action.

### 5. Conversion

■ Finally, we address the producers' cause of action for conversion. The producers alleged that Cinemark obtained financial gain from the showing of a copyrighted film authorized only for a charity screening.

■ To establish a claim for conversion, a plaintiff must prove that (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Apple Imports, Inc. v. Koole*, 945 S.W.2d 895, 899 (Tex.App.-Austin 1997, writ denied). Cinemark moved for summary judgment

on the ground that the producers could not establish any of the elements.

The evidence established that the producers gave Davis permission to use the film. The film was shown as a charity screening. The producers did not tell Davis that Cinemark had to agree to give one-hundred percent of the proceeds to the charity. The producers had *no* communications with Cinemark about the charity screening.[2] Moreover, there is no evidence that the producers demanded the return of the film or that Cinemark refused to return it.

We conclude the trial court properly granted summary judgment on the producers' cause of action for conversion.

### Conclusion

We conclude the trial court properly granted summary judgment in favor of Cinemark on all causes of action. We overrule the producers' third issue. We do not reach the producers's first issue of preemption with respect to the producers' claims of negligent misrepresentation, fraud, and conversion or their second issue with regard to the defense of statute of limitations because we conclude summary judgment was proper as to those claims on other grounds. *See Banfield v. Laidlaw Waste Sys.*, 977 S.W.2d 434, 439 (Tex.App.-Dallas 1998, pet. denied) (not necessary to address issue of preemption with respect to defamation claim because court concluded statement not defamatory as a matter of law); *Lane v. Port Terminal R.R. Ass'n*, 821 S.W.2d 623, 625 (Tex.App.-Houston [14th Dist.] 1991, pet. denied) (summary judgment upheld on grounds of

limitations and privilege thus no need to address preemption ground).

We affirm the trial court's judgment.

---

2. The producers appear to argue that the Lubbock screening was not a charity event because Cinemark received a portion of the proceeds. There is no evidence, however, that a film's screening is treated as a charity event only if all proceeds go to the charity.